Charles McCUEN, John McDowell, Ben Galer, E. Eugene McWhirter, Dale Garrels, A.M. Patterson, Appellees/Cross–Appellants,

v.

AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, Appellant/Cross–Appellee,

Federal Deposit Insurance Corporation, Intervenor/Appellee/Cross–Appellant.

Nos. 90–2901, 90–2993.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 9, 1991.

Decided Oct. 17, 1991.

Rehearing and Rehearing En Banc Denied Nov. 26, 1991.

Michael P. Tone, Chicago, Ill., argued (Michael P. Tone, Anne Fiedler, Chicago, Ill., and Gerald D. Goddard, Burlington, Iowa, on the brief), for appellant.

Thomas Vilsack, Mt. Pleasant, Iowa, argued (Robert F.P. Waterman and Michael P. Byrne, Davenport, Iowa, and Thomas J. Vilsack, Mt. Pleasant, Iowa, on the brief), for appellee, McCuen.

Maria Beatrice Valdez, Washington, D.C., argued (Eugene J. Comey, Robert F. Schiff, Ann S. DuRoss, Colleen B. Bombardier, Richard J. Osterman, Jr., Maria Beatrice Valdez, Washington, D.C. and William M. Graham, Des Moines, Iowa, on the brief), for appellant, FDIC.

Before ARNOLD, JOHN R. GIBSON, and BEAM, Circuit Judges.

ARNOLD, Circuit Judge.

This appeal involves a declaratory judgment action brought by former directors and officers of Capitol Savings and Loan Association of Mt. Pleasant, Iowa, to determine the coverage provided by a policy issued by American Casualty Company.

On January 6, 1987, Capitol Federal Savings Bank ("Capitol Federal") sued the directors and officers of Capitol Savings and

Loan Association ("Capitol Savings"), its corporate predecessor, alleging that they had violated their fiduciary duties and negligently managed the Savings and Loan. (That action is still pending, although the FDIC has replaced Capitol Federal as plaintiff.) The Savings and Loan officials ("S & L officials") immediately looked to their insurer, American Casualty, for protection. After American Casualty denied coverage, the officials filed this action seeking a declaration that American Casualty was obligated to indemnify the insureds for any losses arising out of the Capitol Federal action, to advance the costs of defending that action, and to pay the attorneys' fees, costs, and expenses incurred in bringing this declaratory judgment action. After a thorough analysis of the disputed provisions of the American Casualty policy, the District Court[1] held that the policy required American Casualty to pay the insureds' expenses (including attorneys' fees) in the Capitol Federal action as they were incurred, but that neither the policy nor the law required it to pay the expenses incurred by the insureds in bringing this action for declaratory relief.

American Casualty has appealed the Court's ruling requiring it to provide coverage to the insureds in the Capitol Federal action. The insureds have appealed the Court's ruling denying them reimbursement of their costs in this action. As a preliminary matter, the FDIC argues that the District Court did not enter a final judgment and, consequently, that we lack jurisdiction to hear this appeal. We reject the FDIC's argument and affirm the judgment on the merits.

## I.

We must first deal with the contention of the FDIC that we have no jurisdiction. The claim is that the various decisions entered by the District Court do not amount to a final judgment. The argument is based on the fact that several issues having to do with coverage were not

reached by the District Court. It did not decide, for example, what the over-all limit on coverage is. (This argument, as we shall see later, has dropped out of the case, because the insureds have conceded that the limit is $10,000,000, the figure advocated by American Casualty.) Neither did the Court decide whether coverage was vitiated by acts of deliberate dishonesty on the part of the insureds. Also, the question whether costs of defense, including the insureds' lawyers' fees in the Capitol Federal action, would, if advanced by American Casualty, count against or eat up whatever the over-all limit is, was not decided.

The major difficulty with FDIC's position on this point is that we have already decided in favor of our jurisdiction. Several months ago, the insureds made a motion to dismiss for want of jurisdiction, based essentially on the same arguments. On February 20, 1991, we denied the insureds' motion. That we have power to re-examine this decision, especially since it is a jurisdictional one, is not to be doubted. But the decision is the law of the case, ordinarily to be adhered to in the absence of clear error or manifest injustice. We see no such compelling circumstance here. The District Court has decided most of the issues determinative of American Casualty's coverage. It did not reach certain remaining questions, essentially because they were not ripe: These questions, or the most important of them, at any rate, cannot be decided, as a practical matter, until the Capitol Federal action is tried. Only after the conclusion of the trial, for example, will it be possible to say whether the insureds acted with conscious dishonesty. In effect, the District Court has granted some of the declaratory relief requested, and has denied the rest of it on the ground of ripeness. In addition, strong practical considerations favor our deciding this appeal now. The issues of contract interpretation decided in this opinion will settle the immediate legal rights between the parties, a fact of great practical significance for the upcoming trial of the Capitol Federal ac-

---

**1.** The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

tion. It is not fatal to this line of argument that further relief was sought and effectively denied.

In short, we see nothing clearly wrong or manifestly unjust about the previous order, entered by a motions panel of this Court, denying the insureds' motion to dismiss. The FDIC position is no more than a variation on this theme. We therefore hold, principally on the basis of the previous order of this Court, that we have jurisdiction to hear this appeal, and we turn to the merits.

## II.

This case essentially turns on the answers to two questions: First, was the insurance contract between the S & L officials and American Casualty in effect to provide coverage for a claim actually filed in 1987, and second, if so, what exactly does the contract cover? The parties agree that the answer to the first question depends upon whether the contract language entitled the insureds to purchase extended discovery coverage and, if it did, whether that extended coverage provided protection for a claim filed against the insureds two years after the policy's expiration.

▮ The policy provided coverage for the S & L officials from January 24, 1981, through January 24, 1984. In October of 1983, American Casualty wrote the insureds informing them that the policy would expire on January 24, 1984, and requesting them to complete and return a renewal proposal form, which they did. On December 29, 1983, American Casualty again wrote the insureds conditioning the renewal on several changes: (1) the policy period would be decreased from three years to one year; (2) the deductible would be doubled from $5,000 to $10,000; (3) the premium would be increased; (4) the discovery period would be reduced from twelve months to ninety days; and (5) a regulatory endorsement would be added (excluding coverage for claims related to or arising out of the activities of any regulatory agency). Capitol Savings did not agree to these terms.

In order to explain the parties' arguments and the District Court's holding on this issue, we set out the discovery clause, in pertinent part:

If the Insurer shall cancel or *refuse to renew* this policy, the Association shall have the right, upon payment of seventy-five percent (75%) of the annual premium ..., to an extension of the coverage granted by this policy with respect to any claim or claims which shall be made against the Directors or Officers during the period of twelve calendar months after the date of such cancellation or refusal to renew, but only with respect to any Wrongful Act committed before the date of such cancellation or nonrenewal.

Add. 34 (emphasis ours). The District Court found the new terms proposed by American Casualty to be substantially and materially different from the policy then in effect. American Casualty claims that despite the different terms, this offer of continued coverage was a renewal. Therefore, there was no "refusal to renew" entitling the insureds to exercise the extended discovery clause. The insureds argued, and the District Court held, that such substantial and material differences in the terms amounted to a refusal to renew. The insureds further argued, and the District Court held, that such refusal entitled the insureds to exercise the discovery clause, which they did. We agree with the District Court.

Iowa follows the well-reasoned rule that "renewal" of an insurance policy means continuation of coverage on the same, or nearly the same, terms as the policy being renewed. See *Davis v. Travelers Ins. Co.,* 196 N.W.2d 526, 530 (Iowa 1972); *Johnson v. Federal Life Ins. Co.,* 224 Iowa 797, 276 N.W. 595, 597 (1938). Logically, anything else is not a renewal of the old policy, but an offer of an entirely new policy. American Casualty's argument focuses on the fact that it did not *refuse* to renew the policy. In support of this position, American Casualty states, and we agree, that one accepted meaning of the term "refuse" is "deny." It states further, and we also agree, that it did not "deny" the insureds the opportunity to maintain some coverage

with American Casualty. The fault in American Casualty's analysis lies in the conclusion it draws from those two facts—that is, that it therefore did not "refuse to renew" the policy. Refusing to provide coverage and refusing to renew coverage are not identical concepts. The issue is not what constitutes a refusal, but what constitutes a renewal. American Casualty never got to the last step. It did not refuse to provide (deny) any coverage at all, it simply refused to provide the *same* coverage as was provided under the existing policy—it refused to renew. Accordingly, we affirm the District Court's holding that American Casualty "refused to renew" its policy, thus entitling the insureds to invoke the discovery clause, which they did on February 1, 1984. The exercise by the insureds of the discovery option extended the policy's coverage by twelve months, or until January 24, 1985.

■ Having determined that the insureds were covered until January of 1985 "with respect to any claim or claims" made within the twelve-month discovery period, we now come to the issue of what "claims" the discovery clause covers and what notice of those claims the policy requires. The Coverage Clause, Clause 2(a) provides:

> This policy shall cover Loss in respect of any Wrongful Act committed prior to the termination of this policy arising from any claim made (i) within the policy period or (ii) within the discovery period if the right is exercised by the Association in accordance with Clause 2(b) [the Discovery Clause]. For purposes of this Clause 2(a), any claim made subsequent to the policy period as to which notice was given to the Insurer within the policy period as provided in Clause 6(a), or 6(b), shall be treated as a claim made during the policy period.

Add. 34. The provision of the policy governing notice, Clause 6(a), provides:

> If during the policy period the Association or the Directors or Officers shall: ... (ii) become aware of any occurrence which may subsequently give rise to a claim being made against the Directors and Officers, or any of them, for a

Wrongful Act; and shall, during such period, give written notice thereof to the Insurer as soon as practicable and prior to the date of termination of the policy, then any claim which may subsequently be made against the Directors or Officers arising out of such Wrongful Act shall, for the purpose of this policy, be treated as a claim made during the policy year in which such notice was given.

*Id.* at 35.

It is undisputed that through a series of letters sent by their attorney, the insureds gave American Casualty written notice within the discovery period of "occurrences" which subsequently gave rise to the claims alleged in the Capitol Federal action. The Capitol Federal action was not filed, however, until January 6, 1987, nearly two years after the extended discovery coverage had expired. American Casualty argues that Clause 6 treats the "discovery period" and the "policy period" differently for purposes of giving notice. It contends that the policy allows an insured to give notice of either an occurrence (potential claim) or an actual claim to activate coverage during the policy period, but requires it to give notice of an actual claim to activate coverage during the discovery period. Therefore, argues American Casualty, since the insureds gave notice of only occurrences, or potential claims, during the discovery period, notice was insufficient to trigger coverage when the claims actually arose two years later.

The insureds, on the other hand, understood the policy to allow notice of either a claim or an occurrence during both the so-called policy period and the discovery period. Although following any logical path through the policy provisions is difficult, we will trace our own road below.

Our analysis begins with Clause 2(b), the Discovery Clause. This provision states that it extends coverage with respect to "any claim or claims" made against the insureds during the twelve months following the refusal to renew. Unfortunately, Clause 2(b) does not define "claim." Clause 2(a), the Coverage Clause, states that the policy covers losses arising from

any "claim" made within the policy period or the discovery period, if the latter has been properly elected. It then adds that any "claim" made subsequent to the policy period, if notice was given as provided in Clause 6(a), "shall be treated as a *claim* made during the policy period." (Emphasis ours.) Clause 6(a), governing notice of claims, allows notice of an "occurrence" which later gives rise to a claim to be treated as a "claim" made when the notice was given, even if the actual claim does not arise until long after the policy's termination. This brings us back to the Discovery Clause, which covers "claims" made during the twelve-month discovery period. Reading "claims" in the context of the whole agreement, we hold, as did the Court below, that this term includes a claim arising after termination of the policy as to which notice of the occurrence giving rise to such claim was given during the discovery period.

■ Even if, as American Casualty vigorously argues, the insureds, the District Court, and we have interpreted the policy incorrectly, American Casualty is not helped. At best, the policy provisions regarding what "claims" are covered, or, more importantly, what notice of those claims must be given, are ambiguous. The clearly established rule in Iowa requires the court to construe ambiguities against the insurer. *North Star Mut. Ins. Co. v. Holty*, 402 N.W.2d 452, 454 (Iowa 1987). The law prefers to benefit the insured and afford coverage where the insured relies on a reasonable interpretation of the policy later disputed by the insurer. See *Iowa–Des Moines Nat'l Bank v. Insurance Co. of North America*, 459 F.2d 650 (8th Cir. 1972). The District Court held, and we agree, that the S & L officials' interpretation of the policy was reasonable. In conclusion, we affirm Judge Wolle's holding that the policy was effective to provide coverage for the Capitol Federal action. The Discovery Clause was properly invoked, and notice of occurrences giving rise to the claims in the Capitol Federal action was properly given to American Casualty during the discovery period. This brings

us to the second issue—what does the policy cover.

### III.

Two issues of coverage are presented: first, whether American Casualty has a duty or merely an option to advance defense fees incurred by the insureds, and second, the maximum dollar limit available to the insureds.

■ The policy obligates American Casualty to pay all losses which the insureds "become legally obligated to pay." Loss is defined in Clause 1(d) as "any amount which the Directors and Officers are legally obligated to pay ... and shall include but not be limited to damages, judgments, settlements, costs ..., and *defense of legal actions*, claims or proceedings and appeals therefrom...." Add. 34 (emphasis ours). In the absence of other provisions to the contrary, this clause would obligate American Casualty to pay the insureds' legal fees as incurred. Once again, however, the meaning of this provision is muddled by another policy provision, Clause 5(c), which states that

> [t]he Insurer may at its option and upon request, advance on behalf of the Directors or Officers, or any of them, expenses which they have incurred in connection with claims made against them, prior to disposition of such claims, provided always that in the event it is finally established the Insurer has no liability hereunder, such Directors and Officers agree to repay to the Insurer, upon demand, all monies advanced by virtue of this provision.

Add. 35.

The definition of "Loss" unequivocally includes defense costs, and seems to require American Casualty to pay these costs when the insureds are "legally obligated to pay" them, i.e., when the costs are incurred, and not, as American Casualty appears to suggest, when the lawsuit is finally disposed of and American Casualty has determined that the claims were covered. This is clearly a liability policy, despite American Casualty's attempt to treat it as an indemnity policy. The significance of

this distinction is that under a liability policy, whenever a covered "loss" occurs (i.e., the insureds are "legally obligated to pay"), American Casualty must pay that amount—payment by the insurer is not conditioned upon a previous payment by the insured, as in an indemnity policy. See 11 Couch, *Cyclopedia of Insurance Law* § 44:4 (Rhodes ed., 2d ed. 1982). Although American Casualty does not openly dispute our interpretation of "Loss," it argues that Clause 5(c) negates its duty to pay the insureds' defense costs when they are "legally obligated to pay" them and, instead, gives American Casualty the choice of whether or not to advance these "expenses."

American Casualty relies heavily on *American Casualty Co. v. FDIC*, 677 F.Supp. 600 (N.D.Iowa 1987) (subsequent history omitted), for the proposition that advancement of the insureds' defense fees is optional under the policy. This reliance is misplaced. The insureds in *American Casualty Co. v. FDIC* argued that American Casualty had a *duty to defend* an action brought against them by the FDIC. The Court rejected their argument. In contrast, the insureds in this case are not arguing that the policy obligates American Casualty to defend them, but simply to pay the costs of defense as the insureds incur them. These arguments, though similar in result, are two different arguments, and any discussion of the issue before us by the Court in *American Casualty Co. v. FDIC* was merely dicta.

We believe that the better-reasoned approach to interpreting these provisions was taken by two of our sister circuits in *Little v. MGIC Indemnity Corp.*, 836 F.2d 789 (3d Cir.1987), and *Okada v. MGIC Indemnity Corp.*, 823 F.2d 276 (9th Cir.1986). These courts confronted exactly the same issue and the same policy language now before this Court and held that the policy obligated the insurer to pay the costs of defense as the insureds incurred them. The courts reasoned as follows: First, the Clause defining "Loss," Clause 1(d), imposes a duty upon the insurer to pay the insureds' defense costs as they are incurred; second, Clause 5(c) is ambiguous

and does not clearly abrogate that duty; and third, courts must construe ambiguities in insurance contracts against the insurer and in favor of coverage.

Although it is now apparent that American Casualty intended by the word "expenses" to exclude attorneys' fees and costs of defense from the general rule of Clause 1(d), now is too late. It chose not to define "expenses" in the policy. Even if American Casualty's interpretation of the policy is a reasonable one, it cannot prevail. The District Court found, and we agree, that the insureds' interpretation of the policy is also reasonable. Thus, the policy is ambiguous and, following time-honored rules governing insurance policies, must be construed against American Casualty.

▪ Having determined that the policy does afford coverage for the bank officials' defense costs, we now address the issue of exactly how much American Casualty may be required to pay. As set out above, the policy defines "loss" as "any amount the Directors and Officers are legally obligated to pay ... for a claim or claims made against the Directors and Officers for Wrongful Acts...." The policy also limits American Casualty's liability for a single loss to $1 million. Clause 4(d) further defines American Casualty's liability by providing that "[c]laims based on or arising out of the same act, interrelated acts, or one or more series of similar acts, of one or more of the Directors or Officers shall be considered a single Loss...." American Casualty argued that use of the words "interrelated" and "similar" compelled a finding that there were only three potential losses, based essentially (though not entirely) on its claim that Capitol Savings made all of the loans in question in reliance on, though maybe not directly to, three borrowers. The insureds argued, and the District Court held, that each loan was a separate act, making American Casualty liable for seventeen potential losses.

American Casualty's best argument is that the language of the policy is unambiguous. The construction of a written contract, it says, presents a question of law, as

to which we should review the District Court de novo. We can read the policy as easily as the District Court could. The argument is not without force. Where several loans are made to a single borrower, for example, losses produced by these loans certainly fit a common definition of "similar" or "interrelated." On the other hand, these words are so elastic, so lacking in concrete content, that they import into the contract, in our opinion, substantial ambiguities. Whether a contract is ambiguous is itself a question of law, as to which we have plenary reviewing authority. Exercising this authority, we hold that the District Court correctly held that this portion of the contract is ambiguous. The meaning of the words in this particular case then becomes a question of fact, and the District Court held an evidentiary hearing on this question. The canon that insurance policies or contracts are construed against the issuing company is one of the aids that the trier of fact can use in resolving this kind of question, and the District Court had resort to it here. Its finding, that seventeen losses occurred, instead of three, and that each of the seventeen losses is sufficiently distinct in itself, not to be "similar" to or "interrelated" with the other losses, is not clearly erroneous. We need not repeat the District Court's discussion of the facts leading to its conclusion.

■ One additional point must be made as to the existence of seventeen losses, however. In the District Court, the insureds contended that this holding requires the conclusion that the over-all limit of liability under this policy is $17,000,000. The company, on the other hand, claims that the aggregate limit is $10,000,000, or $1,000,000 for each of the ten officials who are defendants in the Capitol Federal action. It points to the Declarations Page of the policy, item three, which limits coverage to "[o]ne million dollars each Loss; $1 million dollars Aggregate Limit of Liability each policy year for each Director and Officer." App. 1170. A natural reading of this provision produces the conclusion that American Casualty cannot be liable for more than $10,000,000 in the Capitol Feder-

al action. The District Court did not reach this question, but at the oral argument in this Court the insureds conceded it. This concession, which no doubt reflects the view we would have taken had the matter been litigated, makes it unnecessary to discuss the aggregate limit in detail. The over-all limit of American Casualty's liability for claims made in the Capitol Federal action will be $10,000,000, and the District Court, on remand, is instructed to modify its declaratory judgment accordingly.

IV.

■ As a final matter, we address the insureds' cross-appeal. They urge us to award them the attorneys' fees they incurred in bringing this declaratory judgment action. There was no fraud or bad faith here, and no want of fair dealing on the company's part. It raised issues of law that were reasonably litigable. It had a right to do so. As for the contract, we see no language that can reasonably be interpreted to make the company liable for the insureds' attorneys' fees in prosecuting this action for declaratory relief. In general, each party to a lawsuit bears its own fees and costs. This result can be varied by agreement, but no such agreement has been made here.

The insureds point to the following language in the policy in support of their contention:

1(d) The term "Loss" shall mean any amount which the Directors and Officers are legally obligated to pay ... for a claim or claims made against the Directors and Officers for Wrongful Acts and shall include but not be limited to damages, judgment, settlements, costs ..., and defense of legal actions, claims or proceedings and appeals therefrom....

Add. 34.

We think this mention of costs of defense quite clearly refers to the insureds' costs of defending the main action, here the Capitol Federal action. It does not refer to the insureds' expenses in securing a declaratory judgment on the question of coverage. The insureds appear to concede that if

American Casualty had brought this declaratory-judgment action, seeking a declaration of no coverage, the insureds would not have been entitled, even after they won the case, to recover their attorneys' fees and costs from the plaintiff insurance company. There is no reason for a different result to follow here, where the insureds initiated the declaratory-judgment proceeding.

### V.

The judgment of the District Court is affirmed, and the cause is remanded to that Court with instructions to add to its judgment a provision declaring that the over-all aggregate limit of liability under the policy in question for claims asserted in the Capitol Federal action is $10,000,000.

One matter remains to be discussed. We have before us a motion for expedited decision. The parties informed us at the oral argument that the Capitol Federal action is set for trial in the District Court on October 28. They need a decision declaring the rights of the parties under the policy, they say, before the trial begins. This opinion is being filed in time to meet that deadline, and we direct that our mandate issue forthwith. There is no need, therefore, for the motion for an expedited decision, and the motion is denied as moot.

It is so ordered.

BEAM, Circuit Judge, dissenting.

I concur in most of the substantive conclusions reached by the majority. I agree with the FDIC, however, that we lack jurisdiction over most of the claims presented and that we should not entertain an appeal on those claims which may, in our discretion, be granted interlocutory review.

I am initially concerned with the invocation of a "law of the case" theory. It is misplaced as used for two reasons. First, the claims for which there has been no Fed.R.Civ.P. 54(b) certification are simply not ours to review. *See* 28 U.S.C. § 1292(b). Second, the earlier decision

which we made on jurisdiction was incorrect [2] and was based on slightly different arguments than those advanced by the FDIC at oral hearing.

### I. BACKGROUND

I revisit some of the facts in an attempt to present my point of view in an orderly fashion. I cut through some of the interim actions and procedural steps or omit from the discussion certain parties in an endeavor to abstain from needless detail and avoid confusion, if possible.

In January 1987, the Federal Savings and Loan Insurance Corporation (FSLIC) sued Capital Savings' former directors and officers (McCuen parties). FSLIC sought damages for losses incurred by Capitol Savings, alleging various improvident acts by the officers and directors. That suit (underlying action) is styled *FSLIC v. McCuen,* Civ. No. 87–92–D–1 (S.D.Ia.).

The McCuen parties, several months later, filed this suit (declaratory action) against American Casualty Company (ACC), the successor in interest to MGIC Indemnity Corporation [MGIC]. This suit is styled *McCuen v. American Cas. Co.,* Civ. No. 87–54–D–1 (S.D.Ia.). The McCuen parties sought certain declarations of coverage under a policy of insurance issued by MGIC. ACC raised twenty-two affirmative defenses in its answer to the McCuen claims, including allegations that coverage was excluded under the MGIC policy to the extent that the directors and officers (1) gained illegal personal profit or advantage, (2) received payments in violation of law and (3) were dishonest.

The two cases (underlying action and declaratory action) were assigned to different judges. They proceeded on separate tracks for a period of time.

After a bench trial in 1988, the district court issued the first of four decisions rendered to date in the declaratory action. Of interest here, we note that the court found coverage for the McCuen parties under the terms of 'the MGIC policy. Expressly

---

**2.** An administrative panel of this court, on which I was lead judge, denied a motion to dismiss filed by the McCuen parties. As lead judge, I accept primary responsibility for this error. The issue was renewed by FDIC in its substantive brief and at oral hearing.

recognizing that this judgment was not final, the court issued a Rule 54(b) certification for immediate appeal. *See* Findings of Fact, Conclusions of Law, and Declaratory Judgment (Sept. 29, 1988).

The McCuen parties then requested that the district court decide whether ACC had a duty to contemporaneously pay the defense costs in the underlying action. The district court, in December 1988, found such a duty. The district court again certified the judgment for immediate appeal. *See* Order and Enlarged Findings of Fact, Conclusions of Law and Declaratory Judgment (Dec. 15, 1988).

ACC petitioned this court for permission to take an interlocutory appeal under 28 U.S.C. § 1292(b). Permission was *denied*. *McCuen v. American Cas. Co.*, No. 88–8207 (8th Cir. Jan. 24, 1989).

In February 1990, the two cases were, logically, transferred to the same district judge. Later, on the district court's own motion, the cases were consolidated under Fed.R.Civ.P. 42(a) for consideration of two issues common to both cases: (1) whether the McCuen parties gave ACC notice of a particular claim and (2) whether the losses subject to a one million dollar coverage limit were an aggregate of three, as ACC claimed, or were in the number of eighteen, as the McCuen parties claimed.

After trial on April 11, 1990, the district court found no coverage for the particular claim and found that seventeen claims in the underlying action were covered for up to one million dollars each. The district court *did not certify* this order for immediate appeal. *See* Findings of Fact, Conclusions of Law and Partial Declaratory Judgment (Sept. 17, 1990). Furthermore, a motion to reconsider including a request for certification for immediate appeal was heard by the court. Certification was denied with an expression by the court that it did not believe that the *declaratory action* was final or ready for appeal until resolution of the *underlying action*. *See* Hearing Transcript, Motion to Reconsider at 16 (Oct. 12, 1990); *see also* Order (Oct. 12, 1990). In the October 12 order, the district court noted two additional issues in the

declaratory action which it specifically stated that it had not decided—whether the policy provides a maximum aggregate limit of one million dollars per director and whether the payment of costs of defense depleted (cannibalizes) the maximum limits of coverage, whatever they prove to be. Nevertheless, ACC filed this appeal.

The McCuen parties filed a motion to dismiss on the grounds that the appeal was premature until the *underlying action* was concluded. A panel of this court, as indicated, denied the motion. Later, FDIC, the successor to FSLIC, intervened in this appeal. FDIC *in its brief in intervention* argues for dismissal on somewhat different grounds than those raised by the McCuen parties. FDIC emphasizes that the various district court decisions left significant issues in the *declaratory action* unresolved. Specifically, FDIC contends that the three issues involving illegal personal profits or advantage, payments received in violation of law and dishonesty, were not addressed by the district court and were explicitly left open for later consideration after completion of the underlying action.

## II. DISCUSSION

The McCuen parties' argument for dismissal emphasized that all issues in *both* of the consolidated actions had not been resolved. Although the circuits are split on the proper approach to appeals in such a situation—there appears to be four different rules—I would find that *In re Massachusetts Helicopter Airlines, Inc.*, 469 F.2d 439, 441–42 (1st Cir.1972), expresses a workable rule. That is, where all the issues in one suit are decided, that action may be appealed. We do not have that situation here. Thus, our decision to permit the appeal to proceed was based upon a faulty premise and we should not be reluctant to reconsider the matter at this time.

FDIC properly argues the actual situation here. All the issues in the underlying action are unresolved and at least three issues in the declaratory action remain to be decided. These three issues, unresolved and uncertified, must await a decision in the underlying action because they depend

upon factual developments. At least one of the declaratory action claims addressed by the majority, the dollar limits on liability, has been decided by the district court but has not been certified for appeal. The district court, in fact, specifically refused certification on this issue. The majority, nonetheless, has decided to consider the substance of this claim because of a concession on limits of liability announced at oral argument by the McCuen parties. ACC, however, continues to argue in favor of a three million dollar limit, based, at least in part, upon factual matters developed at the April 11 trial which resulted in the partial declaratory judgment dated September 17, 1990. This, as you will recall, is the judgment for which certification was specifically denied by the district court.

## III. CONCLUSION

In sum, then, there is no final decision as contemplated by 28 U.S.C. § 1291 in either action. An order is final when it "ends the litigation on the merits." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978) (quoting *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633–34, 89 L.Ed. 911 (1945)); *accord Barnes v. Bosley*, 790 F.2d 718, 719 (8th Cir.1986) (quoting *Coopers*). We have no jurisdiction over the claims asserted by ACC absent Rule 54(b) certification. We have already denied interlocutory appeal on the only certified claims, which denial *is* the law of the case. Accordingly, we have no jurisdiction and this appeal should be dismissed.