FILED
United States Court of Appeals
Tenth Circuit

November 10, 2009

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

PAYLESS SHOESOURCE, INC.,

      Plaintiff-Counter-Defendant-
Appellant,

v.

THE TRAVELERS COMPANIES,
INC., formerly known as The St. Paul
Travelers Companies, Inc.,

      Defendant-Counter-Claimant-
Appellee.

No. 08-3246

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 07-CV-4075-JAR)**

Mark F. Rosenberg of Sullivan & Cromwell LLP, New York, New York (Michael
J. Abrams and R. Kent Sellers of Lathrop & Gage LLP, Kansas City, Missouri,
with him on the briefs), for Plaintiff-Counter-Defendant-Appellant.

Stephen M. Kerwick of Foulston Siefkin LLP, Wichita, Kansas, for Defendant-
Counter-Claimant-Appellee.

Before **O'BRIEN, SEYMOUR,** and **GORSUCH,** Circuit Judges.

**GORSUCH,** Circuit Judge.

This is a dispute over the meaning of a misplaced modifier. Travelers doesn't disagree that a critical modifying clause in the insurance policy it issued may be misplaced as a matter of good grammar. It argues, though, that the meaning of the document remains clear and clearly excludes coverage for Payless's claim. Payless replies that the (mis)placement of the modifying clause precludes Travelers' interpretation, or at least renders the insurance policy's meaning ambiguous. At summary judgment, the district court rejected Payless's arguments and entered judgment for Travelers. Payless now seeks to have that ruling undone. But while misplaced modifiers are syntactical sins righteously condemned by English teachers everywhere, our job is not to critique the parties' grammar, but only, if possible, to adduce and enforce their contract's meaning. Here, a punctuation peccadillo notwithstanding, the meaning of the parties' contract is unambiguous. By operation of the plain terms of the agreement, Payless has no claim for coverage against Travelers, and so we affirm.

I

This insurance coverage dispute is the offspring of an earlier state class action lawsuit, and some appreciation of that earlier lawsuit is essential to understanding the one now before us. In 2003, a group of present and former Payless employees filed a class action against the company in California state court. Known for the lead plaintiff, Lorena Delgado, the class action suit charged that Payless unlawfully required hourly employees to work "off the clock"

without compensation and did various other things proscribed by the California Labor Code, the California Business & Professions Code, and state common law. When Payless learned of the *Delgado* suit, it notified its insurer, Travelers, and asked the company to cover its litigation costs, as well as any eventual liability Payless might incur. Travelers responded by denying coverage, asserting that the violations of law alleged in *Delgado* fell outside the bounds of the policy's terms.

It is this denial of coverage that gives rise to our current case. After some wrangling, Payless settled with the *Delgado* plaintiffs for approximately $2.45 million, including roughly $1.3 million for class members and $900,000 for their attorneys. Payless then sued Travelers in Kansas state court seeking to recoup these costs and its costs of defending the suit. Travelers removed the case to federal court, noting the parties' diversity of citizenship, and each party eventually filed for summary judgment. In a thorough opinion, the district court granted Travelers' motion, denied Payless's, and entered a final judgment for Travelers. Payless now appeals that judgment, asking us to hold that the parties' insurance contract requires judgment in its favor, or at least precludes entry of judgment for Travelers.

II

We review appeals from a district court's decision to grant summary judgment *de novo*, and will affirm only if, viewing the facts in the light most favorable to the non-movant, we discern no genuine dispute of material fact in

need of resolution by a factfinder and conclude that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In making our Rule 56 assessment in this diversity suit, the parties agree that the substantive law we must apply is Kansas law.

The central battleground on which the parties pitch this appeal is Exclusion A.3 of Payless's Employment Practices Liability Policy. That exclusion states that:

> The Insurer shall not be liable for Loss on account of any Claim made against any Insured . . . for an actual or alleged violation of the *Fair Labor Standards Act* (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, the Employee Retirement Security Act of 1974, any workers' compensation, unemployment insurance, social security, or disability benefits law, *other similar provisions of any federal, state, or local statutory or common law* or any amendments, rules or regulations promulgated under any of the foregoing; provided, however, this exclusion shall not apply to any Claim for any actual or alleged retaliatory treatment on account of the exercise of rights pursuant to any such law, rule or regulation.

J.A. at 24-25 (emphasis added).

Travelers' argument for summary judgment proceeds in two movements. First, it submits that the language of this exclusion unambiguously precludes coverage not just for claims arising under the FLSA, as discussed in the exclusion's first clause, but also for claims involving violations of state laws that are "similar" to the FLSA, pursuant to the exclusion's final clause. Second, Travelers contends that the provisions of state law at issue in the *Delgado* suit are

- 4 -

essentially state analogs to the FLSA and thus excluded from coverage because they are "similar." Payless, of course, vigorously contests both of these moves. In what follows, we consider in turn each of these steps and the parties' competing analyses of them.

A

Travelers begins by arguing that the only reasonable understanding of the plain language of Exclusion A.3 is that the "other similar provisions" phrase applies to and modifies all of the previously listed federal statutes. The policy thus does not require the indemnification of claims for the violation of any state or local law that is "similar" to *any* of the federal statutes previously mentioned. For its part, Payless contends this reading is anything but plain. At the very least, Payless argues, the "other similar provisions" clause might just as well modify only the clause immediately preceding it, rather than every preceding clause in the exclusion. Indeed, Payless submits, sound English grammar suggests that modifying clauses typically attach to the last antecedent, not earlier items, in a list. Applying this rule, Payless would have us read the contract to exclude from coverage only claims concerning violations of state laws that are similar to "workers' compensation, unemployment insurance, social security, or disability benefits law[s]," not those that are similar to any of the other listed federal statutes. In any event, Payless contends that any ambiguity about all this should be construed against Travelers, as the contract's drafter. And because Travelers

only asserts that the allegedly violated state laws are similar to the FLSA (and not to federal workers' compensation, unemployment insurance, social security, or disability laws), Payless argues that the parties' contract guarantees coverage of its losses.

In interpreting a contract, our job is to ascertain and effectuate the parties' intentions whenever possible. *See Ryco Packaging Corp. of Kan. v. Chapelle Int'l, Ltd.*, 926 P.2d 669, 674 (Kan. Ct. App. 1996). Toward this end, under Kansas law we are obliged to ask in the first instance whether the contract, when viewed as a whole, is "clear and unambiguous." *O'Bryan v. Columbia Ins. Group*, 56 P.3d 789, 792 (Kan. 2002). If it is, we are required to enforce the contract "in its plain, ordinary, and popular sense" as a matter of law. *Id.* Of course, if an ambiguity lurks in the parties' agreement, judgment as a matter of law may not be possible. But at the same time, we must take care to avoid "strain[ing] to create an ambiguity where, in common sense, there is none." *First Fin. Ins. Co. v. Bugg*, 962 P.2d 515, 519 (Kan. 1998). After all, ambiguity exists "only . . . where the meaning is genuinely uncertain" and only after we "give[] a reasonable and practical construction in light of the contract as a whole." *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1155 (10th Cir. 2007) (construing Kansas law). Applying these principles to the contract before us, we cannot say — at least not without some considerable straining — that the parties have left any uncertainty about their intentions. Several features of the

agreement conspire to lead us to conclude that Payless's interpretation simply is not a plausible reading of the document.

First, in order for the "other similar provisions" clause plausibly to modify *only* the immediately preceding "workers' compensation" clause rather than *all* of the preceding clauses, as Payless suggests, one would expect a signal suggesting some connection between them. If, for example, the two clauses read " . . . or disability benefits law, *and/or* other similar provisions . . . ," Payless's interpretation might well be plausible. But the contract doesn't read that way. Without some such conjunction, the "other similar provisions" clause bears no more apparent relation to the immediately preceding "workers' compensation" clause than it does to any of the other preceding clauses.

Second, the "other similar provisions" clause is set off by a comma in much the same manner as every other separately enumerated item in the list, thus further indicating its independence from the "workers' compensation" clause. Lists commonly distinguish between separate items by the introduction of commas or semicolons, and that's exactly what we have here. Of course, if a comma or semicolon didn't separate the two clauses, Payless's suggestion that they are more closely connected than the other clauses in the exclusion could bear some scrutiny. *See, e.g.*, *Elliot Coal Min. Co., Inc. v. Dir., Office of Workers' Comp. Programs*, 17 F.3d 616, 630 (3d Cir. 1994) ("[I]t is the absence of a comma or other punctuation before the coordinate conjunction 'or' that would

indicate it and its modifier, the limiting adjective clause, are to be treated separately rather than as part of the whole series."). But, again, that simply is not the contract we have.

Third, the "other similar provisions" clause comes at the end of the exclusion, not stuck somewhere in the middle, and it is at the end of a list where modifiers meant to address all of the preceding items are often found. *See, e.g., Am. Mut. Liability Ins. Co. of Boston v. Meyer*, 115 F.2d 807, 808 (3d Cir. 1940) (interpreting an insurance contract and finding it "obvious that the qualifying clause last quoted should modify all that goes before it"). After all, no airport that posted a sign prohibiting on airplanes "knives, explosives, rifles, other similar items, or any item that could be mistaken for any of the foregoing" would think it had forbidden shotguns but not samurai swords. Shotguns are similar to rifles, just as samurai swords are similar to knives. By placing "other similar items" after the examples, the airport sign clearly means to signal its disapproval of both.

Finally, under Payless's competing reading of the contract, Travelers disclaimed coverage for litigation under a whole host of federal laws — FLSA, NLRA, WARN, COBRA, OSHA, and ERISA — yet retained coverage for intentional violations of similar or identical state laws. And it did all this while expressly disclaiming coverage for liabilities arising under state laws similar to federal workers' compensation laws. On this view of the contract, then, the

parties clearly foresaw the possibility of claims arising under state laws with analogous, even identical, counterparts in federal law; they also demonstrated a knowledge of how to exclude them from coverage; yet, they excluded such claims only haphazardly or randomly. No one before us has suggested how the crazy-quilt scheme of coverage and exclusion resulting from Payless's interpretation — under which Travelers disclaimed responsibility for liabilities arising under certain federal laws but then assumed responsibility for some (but not all) liabilities arising under parallel and even *identical* state laws — could represent a rational understanding of the parties' intent. Indeed, every indication we have before us suggests such a scheme would vitiate that intent. And our obligation "[i]n placing a construction on a written instrument," under Kansas law, is to favor "reasonable rather than unreasonable interpretations." *Arnold v. SJL of Kansas Corp.*, 822 P.2d 64, 67 (Kan. 1991)*; cf. Gore v. Beren*, 867 P.2d 330, 337 (Kan. 1994) (instructing us to avoid "[r]esults which vitiate the purpose or reduce the terms of the contract to an absurdity").[1]

---

[1] Citing *Farmers Automobile Insurance Ass'n v. St. Paul Mercury Insurance Co.*, 482 F.3d 976, 978-79 (7th Cir. 2007), Travelers argues extensively and vigorously that we should disfavor contractual interpretations that create a moral hazard — that is, the incentive for the insured to increase the risky behavior insured against by shifting the costs of that behavior to the insurer. In reply, Payless attacks *Farmers* as an effort to interpret contracts according to a preferred economic theory or public policy, rather than the parties' intentions — a path precluded by Kansas law. *See O'Bryan*, 56 P.3d at 792 ("The court shall not make another contract for the parties and must enforce the contract as made.").

(continued...)

In spite of all this, Payless characterizes its interpretation as at least sufficiently plausible to create an ambiguity about the contract's meaning. In particular, Payless emphasizes the fact that the "other similar provisions" clause appears just after the "workers' compensation" clause and contends that it could well modify only that clause. In aid of its interpretation, Payless invokes the dictum that "relative and qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding." *Liberty Life Ins. Co. v. Guthrie*, 84 P.2d 891, 892 (Kan. 1938). As Payless itself concedes, however, this last antecedent principle is merely an interpretive presumption based on the grammatical rule against misplaced modifiers. Operating on the assumption that most contracts follow most rules of grammar, courts tend to prefer interpretations that conform to those rules. At the same time, though, we know that grammatical rules are bent and broken all the time, and we will not enforce the more grammatical interpretation of a contract "when evident sense and meaning require

---

[1](...continued)

To this, one might respond that, however stated in *Farmers*, the moral hazard question could be reformulated in a way that *does* focus on the parties' intent by asking whether an interpretation that assumes a drafter created a moral hazard is generally a plausible reading of its intent. Even if this is so, however, Payless replies that any such presumption against interpretations creating moral hazards shouldn't pertain in this particular case because the Travelers policy before us indubitably insured against even intentional wrongful employment practices, including intentional breaches of employment contracts. Happily, be all this as it may (or may not), none of it is essential to our decision today. The fact remains that, quite without any resort to *Farmers*, Travelers has succeeded in proving Payless's interpretation of the contract implausible.

a different construction." *Link, Inc. v. City of Hays*, 972 P.2d 753, 758 (Kan. 1999) (internal quotation mark omitted). Or, as the United States Supreme Court has put it, the last antecedent presumption "can assuredly be overcome by other indicia of meaning." *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 355 (2005) (internal quotation marks omitted). Given how common misplaced modifiers are in daily usage, the Supreme Court has candidly acknowledged that "[o]ver the years, such indicia have counseled us against invoking the rule (often unanimously) at least as many times as we have relied on it." *Id.*; *accord Barnhart v. Thomas*, 540 U.S. 20, 26 (2003).

All this underscores that, while the rules of English grammar often afford a valuable starting point to understanding a speaker's meaning, they are violated so often by so many of us that they can hardly be safely relied upon as the end point of any analysis of the parties' plain meaning. So it is that Groucho Marx could joke in *Animal Crackers*, "One morning I shot an elephant in my pajamas. How he got into my pajamas I'll never know," leaving his audience at once amused by the image of a pachyderm stealing into his night clothes and yet certain that Marx meant something very different. In the more mundane task of contract interpretation, we must be no less entitled to acknowledge the parties' plain meaning without being strait-jacketed by a grammatical rule into reaching a patently unintended result. *See Link*, 972 P.2d at 758 ("[I]f application of the last antecedent rule would involve an absurdity, do violence to the plain intent of the

- 11 -

language, or if the context for other reason requires a deviation from the rule, it will be necessary and proper to look for another antecedent.") (internal quotation marks omitted).[2]

Even if the last antecedent presumption doesn't definitively resolve the interpretive issue in its favor, Payless argues that the parties' contract still must be construed against Travelers as its drafter. The sensibility of the *contra proferentem* canon of construction, however, rests in large measure on an assumption of "unequal bargaining strength between the seller and purchaser," *see W. Cas. & Sur. Co. v. Budig*, 516 P.2d 939, 941 (Kan. 1973), supposing as it does the prototypical case of a large insurance company essentially dictating its terms

---

[2] The authority cited by Payless does nothing to disturb this conclusion. In its brief, Payless directs our attention to, among other cases, *Crawford v. Prudential Insurance Co. of America*, 783 P.2d 900, 902 (Kan. 1989), which concerns an exclusion from coverage for claims "covered . . . by any workers' compensation law, occupational disease law or similar legislation." Payless offers this decision to show the reasonable results of its preferred interpretation: policies frequently bunch together workers' compensation and other similar laws. But the case actually shows why the last antecedent rule is only a grammatical rule and not a legal command: if we applied the last antecedent rule to the exclusion Payless cites, that policy would actually disclaim coverage only for "legislation" that is "similar" to "occupational disease law[s]" — and not to "workers' compensation law[s]," as Payless itself suggests. Payless also relies heavily on an unpublished California Court of Appeals opinion, *SWH Corp. v. Select Insurance Co.*, 2006 WL 2786930 (Cal. Ct. App. Oct. 19, 2006). But in *SWH*, the contract's similar state laws clause appeared in the middle of the list of federal statutes, not at the end, and the clause didn't include a reference to "any of the foregoing," which we have here. These material differences between the *SWH* contract and the contract before us deprive the case of any persuasive power.

in an adhesion contract to individuals with relatively little bargaining power. It is less clear whether and to what degree the doctrine has an appropriate role to play when the contracting parties are as sophisticated and able as Payless and Travelers both assuredly are. Indeed, Kansas courts seem to have begun wrestling with just these questions. *See, e.g.*, *Wood River Pipeline Co. v. Willbros Energy Servs. Co.*, 738 P.2d 866, 872 (Kan. 1987) ("The principle that doubtful language in a contract is construed against the drafter is of little consequence . . . [when, among other things, the] clauses were bargained for by two large and sophisticated companies of equal bargaining power, each acting through experienced persons."). But even assuming without deciding the doctrine has some appropriate function in a dispute between commercial Jupiters like Travelers and Payless, it is a function that can be triggered only "if the terms of the policy are ambiguous," *see Fowler v. United Equitable Ins. Co.*, 438 P.2d 46, 48 (Kan. 1968), and not to overcome a contract's plain meaning. For the reasons we've already explained, the exclusion before us in this case is not ambiguous, and the only plausible reading is that it precludes coverage for all state and local laws that are similar to any of the enumerated federal statutes, including the Fair Labor Standards Act. By its own terms, then, the *contra proferentem* canon holds no sway here.

B

Having established that the parties' agreement excludes coverage for claims alleging a violation of laws "similar" to the FLSA, we are still only halfway home. The question remains whether the state laws invoked in the *Delgado* suit meet this test.

The *Delgado* lawsuit alleged, first and foremost, that Payless violated the wage and hour restrictions of the California Labor Code. Payless argues that the CLC and FLSA are not "similar" because, among other things, the FLSA, unlike the California law, does not require employers to provide rest periods, meal periods, or compensation for either. Payless also emphasizes that the CLC requires employers to pay overtime for work in excess of eight hours a day, rather than in excess of forty hours a week as under the FLSA. And Payless renews its contention, albeit in a narrower context now, that any ambiguity in the term "similar" at least requires us to interpret it in a narrow manner against the drafter.

As the district court noted, however, the parties' contract does not require that the federal and state laws at issue be identical — for the exclusion to apply, the laws only must be "similar." The Oxford English Dictionary defines "similar" as meaning "[o]f the same substance or structure throughout; homogenous" or "[h]aving a marked resemblance or likeness; of a like nature or kind." 15 Oxford English Dictionary 490 (2d ed. 1989). Webster's defines the term as meaning "having characteristics in common" or "alike in substance or essentials." Webster's Third New International Dictionary 2120 (2002). Of course, parties to

a contract "may depart from the meanings associated with ordinary English," if they like. *Penncro Assocs.*, 499 F.3d at 1157. But when, as here, the parties have not made manifest their "intention to deviate from common usage," we are left with and must enforce the plain meaning of the language they chose. *Id.*

Neither do we doubt that the CLC and the FLSA qualify as similar under any of these plain language understandings. Both statutes regulate the compensation relationship between employers and employees, enforce minimum working conditions, and create a system of remedies when an employer fails to comply. *See Marek v. Chesny*, 473 U.S. 1, 26 n.32 (1985) (FLSA); *Brewer v. Premier Golf Props.*, 168 Cal. App. 4th 1243, 1252 (Ct. App. 2008) (CLC); *see also Cal. Dairies Inc. v. RSUI Indemnity Co.*, 617 F. Supp. 2d 1023, 1039-44 (E.D. Cal. 2009) (comparing the two). If anything, the minor differences Payless identifies between the two statutes serve only to confirm, rather than call into question, this conclusion: the payment of overtime wages after an eight-hour work day versus a forty-hour work week concern the same subject matter (regulating the terms of the employment relationship) and evince a near identicality of purpose (imposing a floor for when overtime compensation is required), and the means used to effect that purpose (eight hours a day versus forty hours over five days) are themselves highly comparable, if not identical. Many of the purported differences Payless points to, moreover, are borne out not in the texts of the statutes, but in regulations about the statutes. *See, e.g.,*

- 15 -

Opening Brief at 24 (citing Code of Federal Regulations provisions about FLSA).

Yet it is the statutes themselves — and not any agency's or court's interpretations

— that the parties' contract requires us to compare.

Payless directs our attention to decisions holding the term "similar"

ambiguous in other insurance policy contexts in an effort to suggest that the term

as used here must also be ambiguous. We don't doubt that the word "similar" (or

perhaps nearly any word in the English language) can be used in ambiguous ways.

To take just one of Payless's examples, in *McCuen v. American Casualty Co. of

Reading, Pennsylvania*, 946 F.2d 1401 (8th Cir. 1991), the Eighth Circuit found

ambiguous a policy that covered insurance claims arising from "interrelated acts[]

or one or more series of similar acts." *Id.* at 1407-08. It's certainly possible to

see how a consequential ambiguity could arise about whether this or that human

action is "similar" to another given the wide and nearly limitless universe of

potential human behavior. *Cf. id.* at 1408. But in asking whether or not an

ambiguity exists, our analysis does not turn on whether a word *could* be used

ambiguously, or *has* been used ambiguously in other contexts. Rather, we must

ask whether the word *is* used ambiguously within the actual contractual context in

which it appears. After all, when interpreting a contract or statute, we derive

meaning not just from abstract words in isolation, but from their context and from

the document as a whole. *See, e.g.*, *Golden Rule Oil Co. v. Liebst*, 109 P.2d 95,

97 (Kan. 1941) ("It is not a fair interpretation of any document, letter, contract, or

whatnot, to excise from its context a single sentence, statement or paragraph, and give it controlling significance while ignoring the other recitals of the instrument."); *Fiorella v. Travelers Prop. Cas. Ins. Co.*, 142 P.3d 321, 326 (Kan. Ct. App. 2006); *cf. Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (deriving the meaning of a text not just from "the language itself," but also "the specific context in which that language is used[] and the broader context of the statute as a whole"). That context here at once limits and advances our inquiry. The parties' contract in this case asks us only to measure whether one state statute, the CLC, that regulates the workplace is "similar" to another federal statute, the FLSA, that does exactly the same thing. We have no doubt that it is.

Payless's citation of *Morillion v. Royal Packing Co.*, 995 P.2d 139 (Cal. 2000), does nothing to undermine our confidence in this conclusion. There, the California Supreme Court commented that "the federal [FLSA] statutory scheme . . . differs substantially from the state [CLC] scheme." *Id.* at 147. But here again context does much to illuminate meaning. The court's comment came in the course of considering whether and to what degree a California court should rely on federal case law on the FLSA when interpreting a California wage order under the CLC (a question the *Morillion* court ultimately left unresolved). *See id.* at 148; *see also Cal. Dairies*, 617 F. Supp. 2d at 1034. Of course, there is nothing remarkable about the fact that states often choose to interpret their own laws, even those containing similar language to federal laws, without affording

definitive weight to interpretations given federal laws by federal courts. For example, state constitutions containing equal protection and due process guarantees — with language often *identical* to that found in the federal Constitution — are regularly given entirely different content by state courts. *See, e.g., Arizona v. Evans*, 514 U.S. 1, 8 (1995) ("[S]tate courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution."). *See generally* William J. Brennan, Jr., State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977). But the question whether a state may or may not choose to seek guidance from federal precedents when interpreting its own laws is in a whole different league from the question whether the parties now before us in this insurance coverage dispute meant to contract away coverage for a CLC claim. And the fact that *some* observable differences may exist between the FLSA and CLC is neither here nor there. The parties before us obviously used the word "similar" with reference to the enumerated federal statutes in their contract to avoid the inefficiencies associated with listing every state and locality's complementary workplace regulations. We are not entitled to ignore this obvious meaning. What other word, we wonder, could have achieved this feat with more precision and economy?

Having resolved that the FLSA and CLC are "similar" under the plain meaning of the parties' contract, we turn finally to the remaining claims in the

*Delgado* lawsuit — those alleging violations of California Business & Professions Code § 17200, breach of contract, and misrepresentation. A study of the *Delgado* complaint reveals that the class action plaintiffs deployed these additional causes of action simply as supplementary vehicles to recover for the same violations they alleged in their CLC claim. In this way, the *Delgado* plaintiffs were simply adding belts to their braces. Because of the manner in which they were used in this case, we cannot help but say that the state law provisions at issue were "similar" to those in the FLSA. In doing so, we do not mean to suggest that the laws are always "similar" to the FLSA, nor do we doubt that a party could raise claims under each of these laws that would not be covered by the contract's exclusion. We only hold that, given the nature of the claims before us and the manner in which they were deployed, the parties could not reasonably have intended to insure them.

For example, the *Delgado* plaintiffs expressly alleged that Payless violated California Business and Professions Code § 17200 only by violating the California Labor Code's requirements for overtime pay and meal and rest breaks. In their words, Payless violated § 17200 by "depriving Plaintiffs and other members of the general public of the minimum working condition standards and conditions due to them under the California labor laws." *Delgado* Second Am. Compl., J.A. at 147. Thus, a complete overlap exists between the plaintiff's

alleged violation of § 17200 and the CLC. Neither is this overlap particularly remarkable: the California Supreme Court has observed that § 17200 claims often "borrow[] violations from other laws" in just this manner. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003). So it is that without the first cause of action (for violations of the California Labor Code), the second cause of action (for "unfair business practices") simply wouldn't have existed.

The California Labor Code claims likewise overlap with the *Delgado* class's allegations of breach of contract and misrepresentation. The breach of contract claim merely alleged that Payless was contractually obliged to obey the California Labor Code and failed to do so, charging that Payless's breaches were "in violation of Labor Code § 201 and § 202, et seq." *Delgado* Second Am. Compl., J.A. at 147. Payless itself has conceded before us that the alleged contracts did not cover any territory not already mapped in detail by the CLC. As to the *Delgado* class's misrepresentation claim, it didn't even appear as a separate count in the class action complaint, but was folded into the same cause of action as the breach of contract claim. And it likewise alleged that Payless's violation stemmed from its "disseminat[ion] [of] false information to employees concerning their entitlement to meal periods and/or rest breaks." Opening Br. at 3 (citing *Delgado* Second Am. Compl., J.A. at 146). In this way, this count, too, just circled back to violations of the California Labor Code, amounting to an allegation that Payless simply failed to inform its employees accurately about the

CLC's requirements.  Put simply, the CLC provided the substance of each of the plaintiffs' claims and, without the alleged CLC violations, the other claims would've had no content at all.[3]

* * *

We agree with the district court that the plain language of the parties' contract excludes not just claims for violations of the FLSA, but also claims for violations of similar state laws.  And we agree that the state laws at issue in the *Delgado* complaint are just that.  Accordingly, the judgment of the district court is

*Affirmed.*

---

[3] Having found, as the district court also did, that Exclusion A.3 of the parties' contract precludes coverage for Payless's claim, we have no need to reach Travelers' alternative argument that an affirmance is independently required by Exclusion A.9 of the contract.