**LIBERTY MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**PELLA CORPORATION, and Pella Windows and Doors, Inc., Defendants.**

**No. 4:07–cv–00508–JEG.**

United States District Court, S.D. Iowa, Central Division.

May 15, 2009.

Robert V.P. Waterman, Jr., Thomas D. Waterman, Lane & Waterman, LLP, Davenport, IA, Charles W. Browning, Danielle Perez, Jeffrey C. Gerish, Lauren Beth McMillen, Plunkett Cooney, Bloomfield Hills, MI, for Plaintiff.

Richard W. Lozier, Jr., Mark E. Weinhardt, Belin Lamson McCormick Zumback & Flynn, P.C., Des Moines, IA, Keith McKenna, Robin L. Cohen, Sheri E. Hametz, Dickstein Shapiro LLP, New York, NY, for Defendants.

## ORDER

JAMES E. GRITZNER, District Judge.

This matter comes before the Court on cross-motions for partial summary judgment by Plaintiff Liberty Mutual Insurance Company (Liberty Mutual) filed on August 6, 2008, and Defendants Pella Corporation and Pella Windows and Doors, Inc. (collectively, Pella), filed on August 5, 2008. Both parties have filed responses and replies, with the last related filing on January 9, 2009. Each motion seeks a declaration regarding when Liberty Mutual's duty to reimburse Pella's defense costs is triggered under its general commercial liability (GCL) insurance policies. Plaintiff and Defendants requested oral argument; but, given the nature of the issues and the quality of the written materials, the Court finds oral argument unnecessary to resolu-

tion of the current motions. The matter is fully submitted and ready for disposition.

## I.  BACKGROUND

### A.  Procedural Background

This is an insurance coverage dispute that arises out of two putative class action lawsuits brought against Pella by various plaintiffs who purchased windows from Pella for their homes (collectively, the Underlying Lawsuits).[1]  On November 6, 2007, Liberty Mutual filed the instant action seeking a declaratory judgment against Pella regarding the scope of its obligations under the Policies, if any, for the Underlying Lawsuits.  Pella filed its answer and affirmative defenses, as well as various counterclaims, on January 14, 2008.  The counterclaims have been amended twice, the current version being filed on April 21, 2009.

### B.  The Underlying Lawsuits

#### 1.  The *Pappas* suit

The *Pappas* suit was initially filed on November 18, 2002.  The initial complaint alleged that the Pella windows purchased by the Pappas family were defective and/or deficient, which resulted in damage to both their windows and the structure of their home, in addition to personal injury due to exposure to mold contamination. The initial complaint contained three counts: (1) breach of implied warranty of merchantability;  (2) breach of implied warranty of fitness for a particular purpose; and (3) strict liability.

In late 2002, plaintiffs filed an "Amended Class Action Complaint," seeking certification of the *Pappas* suit as a class action lawsuit.  The *Pappas* complaint was amended three more times over the next several years, beginning in October 2004.

The most recent allegations are contained in the "Fourth Amended Class Action Complaint" filed on February 5, 2007. The current version of the complaint continues to allege that Pella windows purchased by the plaintiffs were defective and/or deficient, resulting in damage to the plaintiffs' homes.  It contains a single count for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.

#### 2.  The *Saltzman* suit

The original complaint in the *Saltzman* suit was filed on August 18, 2006, and a First Amended Class Action Complaint was filed shortly thereafter on November 8, 2006.  Both versions of the *Saltzman* complaint allege generally that Pella windows purchased by the plaintiffs were defective and/or deficient, resulting in damage to the plaintiffs' homes.  The current version of the *Saltzman* complaint contains six counts: (1) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq., and substantially similar laws of certain other states; (2) violation of similar uniform deceptive trade practices acts; (3) common law fraud by omission; (4) breach of implied warranty of merchantability; (5) unjust enrichment; and (6) declaratory relief.

### C.  Factual Background

The following facts are not in dispute, or are viewed in a light most favorable to the nonmoving party.  *See, e.g., Shanklin v. Fitzgerald,* 397 F.3d 596, 602 (8th Cir. 2005).  Liberty Mutual and Pella entered into a series of CGL insurance contracts, effective from September 1, 2000, through September 1, 2006 (the Policies).  Each of the Policies is expressly styled as providing coverage for "Excess General Com-

---

1.  The two lawsuits are *Pappas v. Pella Corp. and Pella Windows & Doors,* No. 02–L–14558, pending in the Circuit Court of Cook County, Illinois [hereinafter "the *Pappas* suit"], and

*Saltzman, et al. v. Pella Corp. and Pella Windows & Doors, Inc.,* No. 06–C–4481, pending in the Northern District of Illinois [hereinafter "the *Saltzman* suit"].

mercial Liability." In November of 2002, Pella notified Liberty Mutual of the *Pappas* suit and requested that it provide coverage according to the terms of the Policies. Liberty Mutual purported to reserve its rights with respect to the *Pappas* suit in letters dated July 1, 2003, December 15, 2004, and March 30, 2007. Pella notified Liberty Mutual of the *Saltzman* suit on August 30, 2006, and requested that it provide coverage according to the terms of the Policies. Liberty Mutual purported to reserve its rights with respect to the *Saltzman* suit in letters dated October 26, 2006, and December 11, 2006.

At various times during the dates alleged in the Underlying Lawsuits, Pella was insured under GCL policies from several other insurers (collectively, the other insurers). St. Paul Fire and Marine Insurance Company (St. Paul) issued various consecutive commercial general liability policies to Pella that collectively covered the period December 1, 1990, through September 1, 2000. CNA, through its companies, Transcontinental Insurance Company and American Casualty of Reading, PA, issued various commercial general liability policies to Pella that collectively covered the period December 1, 1990, through December 1, 1993. The Hartford Insurance Company (Hartford) issued various commercial general liability policies to Pella that collectively covered the period December 1, 1993, through September 30, 1999. Lexington Insurance Company (Lexington) issued two commercial general liability policies to Pella that collectively covered the period September 30, 1999, through September 1, 2001. Umbrella and excess umbrella insurance coverage was also provided to Pella by various other insurers in various amounts during the relevant time period.

Both Liberty Mutual and Pella's other insurers have agreed to pay a share of Pella's defense costs for the *Pappas* suit, subject to a full and complete reservation of rights. The other insurers and Liberty Mutual entered into a confidential "Defense Cost Funding Agreement" setting forth their respective obligations. None of the insurers, including Liberty Mutual, have acknowledged Pella's right to coverage for the *Pappas* suit.

Pella's other insurers have also agreed to pay a share of Pella's defense costs for the *Saltzman* suit, again subject to a full and complete reservation of rights. They have entered into another confidential "Defense Cost Funding Agreement" setting forth their respective obligations. Liberty Mutual has refused to participate in the *Saltzman* suit and is not a party to this second Agreement. None of the other insurers have acknowledged Pella's right to coverage for the *Saltzman* suit.

### D. The Policies at Issue

The Policies provide in pertinent part as follows:

**SECTION I—COVERAGES**

**COVERAGE A. EXCESS BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. Insuring Agreement

    a. We will pay those sums in excess of the "Self–Insured Amount" that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this excess insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for in SECTION V SUPPLEMENTARY PAYMENTS/ALLOCATED LOSS ADJUSTMENT EXPENSE. This insurance applies only to "bodily injury" and "property damage" which occurs during the policy period. The "bodily injury" or "property damage" must be caused by

an "occurrence". The "occurrence" must take place in the "coverage territory". The amount we will pay for damages is limited as described in SECTION IV—LIMITS OF INSURANCE.

b. We WILL NOT have the duty to defend or investigate any claim or "suit" seeking damages to which this policy may apply.

c. Rights and duties relating to the defense, settlement and investigation of claims or "suits" to which this policy may apply are set forth in SECTION II—DEFENSE, SETTLEMENT AND INVESTIGATION OF CLAIMS AND "SUITS".

\* \* \*

## SECTION II—DEFENSE, SETTLEMENT AND INVESTIGATION OF CLAIMS AND "SUITS"

Rights and duties relating to the defense, settlement and investigation of claims or "suits" to which this policy may apply (which shall be exercised in good faith) are as follows:

(1) The insured has the duty to defend any "suit". The insured's duty to defend shall be terminated only by (i) our exercise of our right to assume control of the defense of any specific claim or "suit" as set forth in paragraph (2) below; or (ii) the settlement, final adjudication or other termination of such claim or "suit"; or (iii) assumption of the defense by another insurer.

\* \* \*

**2.** The ALAE Endorsement that was in effect from September 1, 2005, through September 1, 2006, was slightly different, in that it provided,

Where the insured controls the defense, we will reimburse the insured for "Allocated Loss Adjustment Expense" incurred by the insured for any "occurrence" after the

(2) We have the right at any time, upon written notice to you, to assume control of the defense (including selection and termination of attorneys) or investigation of any claim or "suit". . . .

(3) We have the right at any time to associate at our own expense in the defense, investigation or settlement of any claim or "suit".

\* \* \*

By endorsement, each of the Policies in effect from 9/1/00 to 9/1/05 include a section that states:

## SUPPLEMENTARY PAYMENTS/ALLOCATED LOSS ADJUSTMENT EXPENSE

This endorsement modifies insurance provided under the following:

EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART SECTION V—SUPPLEMENTARY PAYMENTS/ALLOCATED LOSS ADJUSTMENT EXPENSE is deleted and replaced with the following:

1. "Allocated Loss Adjustment Expenses" paid by the insured will reduce the "self-insured amount";

2. For each "occurrence" we will reimburse the insured for "Allocated Loss Adjustment Expense" paid by or on behalf of the insured in excess of the "self-insured amount". Our obligation to reimburse the insured is limited as set forth in the SECTION II—DEFENSE, SETTLEMENT AND INVESTIGATION OF CLAIMS, paragraphs (5) and (6).[2]

\* \* \*

"Self–Insured Amount" has been exhausted by the payment of damages and/or "Allocated Loss Adjustment Expense" by the insured for that "occurrence." Our obligation to reimburse the insured is limited as set forth in the SECTION II—DEFENSE, SETTLEMENT AND INVESTIGATION OF CLAIMS, paragraphs (5) and (6).

The Policies also contain the following definitions:

**SECTION VII—DEFINITIONS**

\* \* \*

2. "Allocated Loss Adjustment Expense" includes but is not limited to: (a) reasonable attorneys' fees for claims in suit (reasonable attorneys' fees means rates which are actually paid by us to attorneys retained in the ordinary course of business in the defense of similar actions in the community where the claim is being defended)[.]

\* \* \*

10. "Occurrence" means: (a) an accident, including continuous or repeated exposure to substantially the same general harmful conditions[.]

\* \* \*

11. "Other Insurance" means any other valid and collectible insurance, whether primary, excess, contingent or on any other basis, except any such insurance purchased by the insured specifically to apply in excess of this insurance.

\* \* \*

15. "Self-insured Amount" means: (a) If the insured has no "other insurance" or has "other insurance" less that the "Self-insured Amount": (1) With respect to damages which this policy (including any endorsements(s) thereto) applies on an each "occurrence" basis: As to each "occurrence", the amount shown in the Declarations under Item 4, Self–Insured Amount.

\* \* \*

(b) If the insured has "other insurance" greater than or equal to the "Self-insured Amount": All amounts payable or retained under such "other insurance": but not less than the amount shown in the Declarations under Item 4, Self–Insured Amount[.]

\* \* \*

16. "Suit" means "a civil proceeding in which damages because of 'property damage' ... to which this insurance applies are alleged."

## II. DISCUSSION

### A. Legal Background

### 1. Standard for Summary Judgment

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Skare v. Extendicare Health Servs., Inc.*, 515 F.3d 836, 840 (8th Cir.2008). "In considering a motion for summary judgment the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Thomas v. Corwin*, 483 F.3d 516, 526–27 (8th Cir. 2007). Rather, the Court focuses "on whether a genuine issue of material fact exists for trial—an issue of material fact is genuine if the evidence is sufficient to allow a reasonable jury verdict for the nonmoving party."[3] *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir.2008) (citing *Anderson v. Liberty Lobby, Inc.,*

---

**3.** "The mere existence of some alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505; *Wells Fargo Fin. Leasing, Inc. v. LMT Fette, Inc.*, 382 F.3d 852, 856 (8th Cir.2004).

477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Because the interpretation and construction of insurance policies is a question of law for the Court to decide, issues involving an insurer's obligations under an insurance policy "are particularly amenable to summary judgment." *Pekin Ins. Co. v. Tysa, Inc.,* No. 3:05–cv–00030–JEG, 2006 WL 3827232, *4 (S.D.Iowa Dec. 27, 2006) (quoting *Reliance Ins. Co. v. Shenandoah South, Inc.,* 81 F.3d 789, 791 (8th Cir.1996)).

### 2. General Insurance Principles

"The construction and interpretation of an insurance policy is a question of law for the court to decide." *Johnson v. Farm Bureau Mut. Ins. Co.,* 533 N.W.2d 203, 206 (Iowa 1995) (citation omitted). Under Iowa law, the principles governing the interpretation and construction of insurance policies are well-established.

> The cardinal principle in the construction and interpretation of insurance policies is that the intent of the parties at the time the policy was sold must control. Except in cases of ambiguity, the intent of the parties is determined by the language of the policy. An ambiguity exists if, after the application of pertinent rules of interpretation to the policy, a genuine uncertainty results as to which one of two or more meanings is the proper one.

*LeMars Mut. Ins. Co. v. Joffer,* 574 N.W.2d 303, 307 (Iowa 1998) (internal quotations and citations omitted).

"Construction, the legal effect of a policy, is always a matter of law to be decided by the court." *Grinnell Mut. Reinsurance Co. v. Voeltz,* 431 N.W.2d 783, 785 (Iowa 1988) (citations omitted). "When construing insurance policies we consider the effect of the policy as a whole, in light of all declarations, riders, or endorsements attached." *Ferguson v. Allied Mut. Ins. Co.,* 512 N.W.2d 296, 299 (Iowa 1994) (citation omitted). In construing an insurance poli-cy, "the court is permitted to consider the surrounding circumstances, the situation of the parties, and the objects the parties were striving to attain." *LeMars Mut. Ins. Co. v. Farm & City Ins. Co.,* 494 N.W.2d 216, 218 (Iowa 1992) (citations omitted). "The type of policy obtained and scope of each policy's coverage are evidence of the 'objects the parties were striving to attain' which we can consider to determine the priority of these policies." *Id.* (internal quotation omitted).

Interpretation requires a court to determine the meaning of contractual words. *Joffer,* 574 N.W.2d at 306. Interpretation "is an issue for the court unless it depends on extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence." *Grinnell Mut.,* 431 N.W.2d at 785. " 'An ambiguity exists if, after the application of pertinent rules of interpretation to the policy, a genuine uncertainty results as to which one of two or more meanings is the proper one.' " *Joffer,* 574 N.W.2d at 307 (internal quotation omitted). The test for ambiguity is an objective one: "Is the language fairly susceptible to two interpretations?" *Id.* at 308 (citation omitted). A "mere disagreement" between the parties regarding the meaning of terms, however, does not automatically establish an ambiguity. *Id.* (citation omitted). The Court "will not give a strained or unnatural reading to the words of the policy to create ambiguity where there is none." *West Trucking Line, Inc. v. Northland Ins. Co.,* 459 N.W.2d 262, 263 (Iowa 1990). "Because of the adhesive nature of insurance policies, their provisions are construed in the light most favorable to the insured." *Joffer,* 574 N.W.2d at 307 (citation omitted).

### 3. Duty to Defend and/or Reimburse Defense Costs

The Iowa Supreme Court has described an insurer's general duty to defend in this way:

An insurer's duty to defend is separate from its duty to indemnify; the duty to defend is broader than the duty to indemnify. The duty to defend arises whenever there is potential or possible liability to indemnify the insured based on the facts appearing at the outset of the case. In other words, the duty to defend rests solely on whether the petition contains any allegations that arguably or potentially bring the action within the policy coverage. If any claim alleged against the insured can rationally be said to fall within such coverage, the insurer must defend the entire action. In case of doubt as to whether the petition alleges a claim that is covered by the policy, the doubt is resolved in favor of the insured.

*Employers Mut. Cas. Co. v. Cedar Rapids Television Co.*, 552 N.W.2d 639, 641 (Iowa 1996) (quoting *A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.*, 475 N.W.2d 607, 627 (Iowa 1991) (en banc) (citations omitted) (emphasis added)). In determining whether there is a duty to defend, the Court looks "first and primarily to the petition for the facts at the outset of the case." *First Newton Nat'l Bank v. Gen. Cas. Co.*, 426 N.W.2d 618, 623 (Iowa 1988) (internal quotation omitted). It is the allegations of fact in the underlying complaint, not the legal labels under which a plaintiff decides to seek relief, that determine the scope of the duty to defend. *See Employers Mut.*, 552 N.W.2d at 642 (noting that "it is clear under Iowa law that an insurance company is to look at the allegations of fact in the third-party plaintiff's petition against the insured and not the legal theories on which the third-party claims insured is liable.").

An insurer's duty to reimburse defense costs is different from a duty to defend, although generally "similar in result." *McCuen v. Am. Cas. Co. of Reading, Pennsylvania*, 946 F.2d 1401, 1407 (8th Cir.1991). Courts that have compared the two duties "generally have viewed an insurer's duty to advance defense costs as an obligation congruent to the insurer's duty to defend, concluding that the duty arises if the allegations in the complaint could, if proven, give rise to a duty to indemnify." *Fed. Ins. Co. v. Sammons Fin. Group, Inc.*, 595 F.Supp.2d 962, 976 (S.D.Iowa 2009) (citing case law from the various states). In other words, "there does not exist a significant difference between the duty to defend and the promise to advance defense costs, other than the difference between who will direct the defense." *Hurley v. Columbia Cas. Co.*, 976 F.Supp. 268, 275 (D.Del.1997). Absent a clear expression of intent to the contrary, courts generally find that a duty to reimburse defense costs is a contemporaneous one. *See McCuen*, 946 F.2d at 1407; *F.D.I.C. v. Booth*, 824 F.Supp. 76, 81 (M.D.La.1993) (holding that "like the majority of courts facing this issue ... [the insurer] is required to pay defense costs when they are incurred by the insured.").

## B. Analysis

The parties' respective motions for summary judgment address the same basic issue, namely the question of what triggers Liberty Mutual's duty to reimburse Pella's defense costs. Pella argues that, in accord with Iowa law, Liberty Mutual's duty is triggered by the *allegations* in the Underlying Lawsuits; and accordingly, so long as the Underlying Lawsuits *allege* covered "property damage," Liberty Mutual must reimburse Pella's defense costs in excess of the "Self-insured Amount." According to Pella, the "Self-insured Amount" is exceeded when it incurs defense costs in excess of the amount shown in "Item 4, Self-Insured Amount" of the Policies' respective Declarations.

Liberty Mutual agrees that the Underlying Lawsuits must *allege* covered "property damage." It contends, however, that

the Policies also explicitly require that an *actual* "occurrence" be established for its duty to be triggered. Accordingly, Liberty Mutual argues that its duty to reimburse Pella's defense costs has not been triggered, as there has been no determination that an *actual* "occurrence" took place.[4] In addition, Liberty Mutual contends that the Policies are "true excess" policies, and any applicable "Self-insured Amount" is not exceeded until all amount of coverage under any "other insurance" is exhausted. Both parties seek summary judgment in the form of a declaration affirming their respective positions.

### 1. Does Liberty Mutual's duty to reimburse defense costs require an actual "occurrence"?

■ The parties agree that the Policies, as originally drafted, were unambiguous with respect to what triggered Liberty Mutual's duty to reimburse Pella's defense costs. The original ALAE section set forth a specific formula for the reimbursement of defense costs, which implicitly required that defense costs were to be reimbursed *only* when damages were actually paid under the Policies:

> Where the insured controls the defense, we will reimburse the insured for our proper share of the "Allocated Loss Adjustment Expense" paid by the insured for each "occurrence". Our proper share of the paid "Allocated Loss Adjustment Expense" shall be the ratio that the amount of damages paid under our policy for such "occurrence," bears

to the sum of that amount plus the "Self-insured Amount".

Def.'s App. at 43. Because the "amount of damages paid under our policy" was necessarily indeterminable until the conclusion of any underlying litigation, Liberty Mutual's duty to reimburse defense costs, if any, could not be determined until that time as well.

This arrangement changed, however, when the parties retroactively deleted the original ALAE section and replaced it with a new provision [hereinafter the "ALAE Endorsement."].[5] Under the terms of the ALAE Endorsement, there was no longer any formula that determined Liberty Mutual's defense obligations. Instead, the new section provided,

> For each "occurrence" we will reimburse the insured for "Allocated Loss Adjustment Expense" paid by or on behalf of the insured in excess of the "self-insured amount."

*Id.* at 33. The parties agree that the intent behind this change was, in part, to remove the requirement that the Policies pay actual damages before Liberty Mutual's duty to reimburse Pella's defense costs was triggered. Their disagreement centers on the operative meaning of the carried-over phrase, "for each occurrence."

The Court first turns to the language of the Policies. The definition of the term "Allocated Loss Adjustment Expense" provided in the Policies includes attorneys' fees for claims in "suit," and a "suit" is defined to include any civil proceeding in which "property damage" caused by an

---

**4.** Liberty Mutual also seeks summary judgment in the form of a declaration that it has no general duty to defend under the terms of the Policies. Pella does not resist, and in fact concedes the point. *See* Def.'s Resp. at 10 (Clerk's No. 66) (noting that "[i]t is true, but irrelevant, that Liberty Mutual's Policies 'do not contain a duty to defend.' "). Accordingly, Liberty Mutual's motion for summary judgment declaring that it has no duty to

defend Pella under the terms of the Policies is granted. There is no disagreement, however, that Liberty Mutual has undertaken a duty to reimburse Pella's defense costs as set forth by the terms of the Policies.

**5.** The ALAE Endorsement was included at the time of issue in the 2003–2004, 2004–2005, and 2005–2006 Policies, and was retroactively added to the earlier Policies in early 2004.

"occurrence" is *"alleged."* [6]  *Id.* at 49, 54 (emphasis added). Therefore, when the Policies state that Liberty Mutual will reimburse the insured for "Allocated Loss Adjustment Expense," the clear implication is that any such reimbursement is intended to be provided in situations of *potential* coverage.

Liberty Mutual concedes this point; [7] however, it argues that the language "for each occurrence" found in the ALAE Endorsement is intended to impose an additional limitation on its duty to reimburse Pella's defense costs. Its argument is based on the definition of "occurrence" provided in the Policies as follows:

> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

*Id.* at 49. Liberty Mutual contends that the term "an accident" means what it says—i.e. an *actual* accident, as opposed to an *alleged* accident—and accordingly, the phrase "for each occurrence" requires that an actual accident must be established before its duty to reimburse Pella's defense costs is triggered.

Pella agrees that the phrase "for each occurrence" was intended to be an additional limitation on Liberty Mutual's duty, but for a different reason. It argues that the phrase must viewed in the context that it is used—that is, as a limitation on the term "Allocated Loss Adjustment Expense." Given that the term "Allocated

Loss Adjustment Expense" refers to underlying litigation costs in which "property damage" caused by an "occurrence" is *alleged,* Pella argues that the phrase "for each occurrence" was intended to require that a separate "Self-insured Amount" must be met for each of the "occurrences" *alleged* in the relevant underlying litigation. In other words, if any underlying litigation *alleges* more than one "occurrence," a separate "Self-insured Amount" must be met for each of the *alleged* "occurrences."

The Court agrees that the context of the phrase "for each occurrence" is critical and, after reviewing the policy language at issue, finds that Pella's interpretation of the ALAE Endorsement is sustainable. It is consistent with the language and structure of the Policies, particularly given that the definition of "Allocated Loss Adjustment Expense" includes attorneys' fees in cases where a covered "occurrence" is *alleged.* The phrase "for each occurrence" does not unambiguously alter Liberty Mutual's obligation to reimburse Pella for its "Allocated Loss Adjustment Expense," as that term is defined. Given this finding, the Court need not determine whether Liberty Mutual's interpretation is also reasonable, as under Iowa law, the interpretation of the insured is adopted "[w]hen the meaning of terms in an insurance policy is susceptible to two interpretations." *AMCO Ins. Co. v. Rossman,* 518 N.W.2d 333, 334 (Iowa 1994). [8]  If Liberty Mutual

---

6. While the definition of ALAE does not expressly require that an occurrence be alleged, it does require " 'property damage' ... to which this insurance applies [is] alleged." Def.'s App. at 54. Given that the "Insuring Agreement" provides that the Policies apply *only* to "property damage" that is caused by an "occurrence," *id.* at 34, the definition of ALAE necessarily requires that an "occurrence" be alleged.

7. Liberty Mutual has filed a motion for summary judgment on the grounds that the *Pap-*

*pas* lawsuit does not *allege* an "occurrence." *See* Clerk's No. 96.

8. The Court notes that insurance contracts typically premise an insurer's defense cost obligations on either the allegations found in the underlying complaint(s) or a coverage determination at the conclusion of the litigation. Under Liberty Mutual's proposed interpretation, however, its duty to reimburse Pella's defense costs is apparently tied to both—there would be no coverage if an "occurrence" is not alleged in the Underlying Lawsuits, yet

indeed intended to limit its coverage obligations in the way it claims, it could have done so in a manner that was clear and not subject to other reasonable interpretations. Accordingly, the Court holds that Liberty Mutual has a contemporaneous duty to reimburse Pella's "Allocated Loss Adjustment Expense" in excess of the "Self-insured Amount," so long as the Underlying Lawsuits contain allegations that potentially bring the action within the policy coverage.

### 2. When is the "Self-insured Amount" exceeded?

■ Liberty Mutual has undertaken the duty to reimburse Pella's defense costs incurred in the Underlying Lawsuits when those costs are "in excess" of the "Self-insured Amount." Def.'s App. at 34. In most instances, a self-insured retention is "a specific amount of loss that is not covered by the policy but instead must be borne by the insured;" and accordingly, the inquiry into whether it has been exceeded is relatively straightforward. *Gen. Star Nat'l Ins. Corp. v. World Oil Co.*, 973 F.Supp. 943, 948–49 (C.D.Cal.1997). Rather than simply setting forth an amount of loss that must be borne by the insured before coverage is triggered, however, the Policies incorporate an "other insurance" provision into the very definition of "Self-insured Amount":

"Self-insured Amount" means:

\*     \*     \*

(b) If the insured has "other insurance" greater than or equal to the "Self-insured Amount":

All amounts payable or retained under such "other insurance": but not less than the amount shown in the Declarations under Item 4, Self–Insured Amount.

Def.'s App. at 54.[9]

Pella argues that the Policies are primary insurance policies, and the policy language must be viewed in that context. Viewed in this proper context, Pella contends that coverage under the Policies is "excess" only to the amount shown in the respective Declarations under Item 4, Self–Insured Amount, as under well-established law, "other insurance" provisions found in policies providing primary coverage govern the relationship *between insurers*, and do not diminish an insured's coverage rights under any concurrent insurance policies. Accordingly, Pella argues that Liberty Mutual's duty to reimburse its defense costs is triggered as soon as Pella incurs defense costs in ex-

even if an "occurrence" were alleged, there would be no coverage unless and until Pella definitively established that an "occurrence" actually took place. Such a result would seem to make little practical sense, other than to give the insurer two chances for denying coverage. An insurer could, of course, draft such a policy if it so desired, but such limitations would be burdened with the legal requirement that they be set forth in clear and certain terms, which is not the case here. *See Thomas v. Progressive Cas. Ins. Co.*, 749 N.W.2d 678, 682 (Iowa 2008) ("An insurer assumes a duty to define any limitations or exclusionary clauses in clear and explicit terms.") (internal quotation omitted).

The Court also finds the importance that Liberty Mutual places on the presence of an actual "occurrence" to be implausible. Liberty Mutual is, in effect, arguing that it intended to draft a policy that premised defense coverage on an actual "occurrence," which for all practical purposes cannot be definitively determined until the close of the underlying litigation; yet it did not require there be actual "property damage," or even that the actual "occurrence" caused any damage at all.

9. The Policies also contain a separate "other insurance" provision, which provides that "[i]nsurance provided under this policy, including all endorsements thereto, is excess over the 'Self-insured Amount.'" Def.'s App. at 49.

cess of the amount shown in the respective Declarations under "Item 4, Self–Insured Amount." *See, e.g.,* Def.'s App. at 1.

In contrast, Liberty Mutual argues that the Policies are "true excess" policies, and, under well-established law, it is not required to reimburse Pella's defense costs so long as any primary coverage is available. It contends that the language of the Policies on this point is unambiguous, as the Policies provide coverage only when Pella incurs defense costs in excess of "[a]ll amounts payable or retained under [its] other insurance." *Id.* at 54.

■ The Court agrees that the distinction between the two types of policies is critical. An "other insurance" clause found in a primary policy is an attempt by the insurer "to define which coverage is primary and which coverage is excess *between policies.*" *Progressive N. Ins. Co. v. Hall,* 288 Wis.2d 282, 709 N.W.2d 46, 52 (2006) (emphasis added). In other words, "[o]ther insurance clauses govern the relationship between insurers, they do not affect the right of the insured to recover under each concurrent policy.'" *Id.* (internal citations omitted); *see also Zurich Ins. Co. v. Northbrook Excess and Surplus Ins. Co.,* 145 Ill.App.3d 175, 98 Ill.Dec. 512, 494 N.E.2d 634, 650 (1986) (holding that " 'other insurance' provisions do not affect the insurer's duty to the insured to provide full defense and indemnification."). In the case of a "true excess" policy, however, any underlying primary insurance must be exhausted before coverage under the excess policy is triggered. *Farm & City Ins. Co.,* 494 N.W.2d at 219.

The express purpose of a "true excess" policy "is to protect the insured in the event of a catastrophic loss in which liability exceeds the available primary coverage." *Nat'l Sur. Corp. v. Ranger Ins. Co.,* 260 F.3d 881, 885 (8th Cir.2001) (internal quotation omitted). Such a policy typically "require[s] the existence of a primary policy as a condition of coverage." *Id.* at 885; *see also Interco Inc. v. Nat'l Sur. Corp.,* 900 F.2d 1264, 1267 (8th Cir.1990) ("Excess coverage is liability that attaches only after a predetermined amount of primary coverage is exhausted."). A "true excess" policy is excess in all instances except for limited circumstances, and its nature is reflected by low premiums compared to the typically large amount of risk insured. *Farm & City Ins. Co.,* 494 N.W.2d at 218. In contrast, primary insurance "is a policy purchased to be the first tier of insurance coverage, one which is intended to kick in the moment liability is established, but which may be excess in certain, specified situations." *Id.*

The Court finds that the indicia of a "true excess" policy discussed above are not present in the Policies, regardless of the fact that the Policies are labeled as "excess coverage." Not only do the Policies *not require* the existence of a primary policy as a condition of coverage (nor list any underlying schedule of insurance that they are excess to), they were in fact Pella's *only* GCL coverage for five of the six years that they were in effect. Under such circumstances, it cannot plausibly be argued that the Policies were intended to be excess in all instances, with only limited exceptions. The fact that they are labeled as "excess coverage" does not change this.

Furthermore, the amount of coverage provided by the Policies is very similar to that provided by the earlier-issued policies, which Liberty Mutual characterizes as "primary." For example, concurrent coverage under the Lexington policy in effect from 9/1/2000–9/1/2001 was subject to a per occurrence limit of $1,000,000, and an aggregate policy limit of $2,000,000, and coverage under the St. Paul policy in effect from 9/1/1999–9/1/2000 was subject to a per "event" limit of $500,000, an aggregate

policy limit of $2,000,000, and contained a $500,000 self-insured retention, to which the various policy limits were excess. Def.'s App. at 727, 954.[10] The fact that Liberty Mutual contracted to provide virtually the same level of coverage as Pella's other "primary" policies indicates that the Policies were not intended to be "true excess" policies designed to cover catastrophic loss.[11] Rather, this is consistent with coverage under a primary policy, which may be excess in certain situations.[12]

Given the analysis above, this Court concludes that the Policies were intended to provide primary coverage and accordingly are not "true excess" policies. It is clear that, in all instances, coverage under the Policies is triggered only when Pella's defense costs are "in excess" of the "Self–Insured" amount shown in Item 4 in each of the Policies' respective Declarations. Consistent with the law discussed above regarding "other insurance" provisions contained in primary insurance policies, the issue of whether the Policies are "excess" to any of the earlier-issued policies is one between Liberty Mutual and Pella's various other insurers, none of whom are party to this litigation. The resolution of that issue does not affect Pella's right to coverage under the Policies. The fact that Liberty Mutual chose to insert an "other

insurance" provision into the definition of "Self-insured Amount" does not alter this conclusion. Accordingly, this Court holds that Liberty Mutual's duty to reimburse Pella's "Allocated Loss Adjustment Expense" incurred in the Underlying Lawsuits is triggered when, on a per-occurrence basis, those costs are in "excess" of the amount shown in "Item 4, Self–Insured" of any of the Policies that provide coverage.[13]

## III. CONCLUSION

For the foregoing reasons, the Court holds as follows:

1.  Liberty Mutual's motion for partial summary judgment (Clerk's No. 60) in the form of a declaration that it owes no general "duty to defend" under the Policies must be **GRANTED.**

2.  Pella's motion for partial summary judgment (Clerk's No. 56) in the form of a declaration that Liberty Mutual must reimburse Pella's "Allocated Loss Adjustment Expense" as it is incurred, so long as there is a potential for coverage under the Policies, and any applicable "Self–Insured Amount" set forth in the Poli-

---

**10.** Compare that with the Liberty Mutual policy in effect during this same time period, which provided a per occurrence limit of $500,000, an aggregate policy limit of $2,000,000, and a self-insured retention of $500,000. Def.'s App. at 1.

**11.** The record is inadequate for the Court to make any meaningful comparison between the premiums paid for Liberty Mutual Policies and the earlier-issued policies. However, from the limited information provided, it appears that the premiums paid did not differ substantially.

**12.** Pella also carried umbrella coverage during the relevant time periods. For example, one such "umbrella" policy covering 9/1/01–

9/1/02 provided Pella with $5 million of per "occurrence" coverage in exchange for virtually the same premium paid for the Liberty Mutual policy covering the same time period, and contained a self-insured retention of only $10,000. Def.'s App. at 966. Contrast this with the Liberty Mutual Policy covering the same time period, which provided a $500,000 per "occurrence" limit, in excess of a $500,000 self-insured retention.

**13.** In so holding, the Court does not address whether there is a potential for coverage of the Underlying Lawsuits under the Policies. Both parties have motions for summary judgment pending on that issue, which is not the subject of the present opinion.

cies' Declarations is satisfied, must be **GRANTED**.

3. Liberty Mutual's motion for partial summary judgment (Clerk's No. 60) in the form of a declaration that it has no duty to reimburse Pella's "Allocated Loss Adjustment Expense" unless and until an actual "occurrence" is established must be **DENIED**.

4. Liberty Mutual's motion for partial summary judgment (Clerk's No. 60) in the form of a declaration that it has no duty to reimburse Pella's "Allocated Loss Adjustment Expense" while that amount is being paid or is payable by "other insurance" must be **DENIED**.

**IT IS SO ORDERED.**